JOHN VINAL *vs.* CONTRIBUTORY RETIREMENT APPEAL BOARD
& another.[1]

Middlesex.  November 6, 1981. — January 25, 1982.

Present: HALE, C.J., GRANT, & GREANEY, JJ.

*Contributory Retirement Appeal Board.  Division of Hearings Officers.
Administrative Law*, Hearing.  *Retirement.*

Where a decision of the Contributory Retirement Appeal Board, con-
trary to the recommendation of a hearings officer, denying an applica-
tion for a disability retirement allowance in a proceeding under G. L.
c. 32, § 16(4), made no reference to the consideration the board had
given to the hearings officer's findings of fact and did not set forth the
subsidiary findings on which the decision was based, as required by
G. L. c. 30A, § 11(8), the appropriate action for a reviewing court
was to remand the case to the board for revision of its decision so as to
comply with § 11(8). [91-93]
The Contributory Retirement Appeal Board, in a proceeding under G. L.
c. 32, § 16(4), should afford some deference to the subsidiary findings
of fact by the hearings officer to whom the matter is referred, and
should afford substantial deference to those findings which rest on the
hearings officer's resolution of credibility questions; a decision reject-
ing the hearings officer's subsidiary findings should contain a con-
sidered articulation of the reasons for that rejection. [93-101]


CIVIL ACTION commenced in the Superior Court Depart-
ment on October 31, 1978.

The case was heard by *Dolan*, J.

*William A. Mitchell*, Assistant Attorney General, for
Contributory Retirement Appeal Board.

*Joseph L. Doherty, Jr.* (*Robert B. Gould* with him) for
the plaintiff.

*John P. Donohue, Jr.*, for the intervener, submitted a
brief.

---

[1] Middlesex County retirement board.

HALE, C.J. This action was brought in the Superior Court pursuant to G. L. c. 30A, § 14, for a review of an adjudication made by the defendant Contributory Retirement Appeal Board (appeal board) under the provisions of G. L. c. 32, § 16(4). That decision upheld a decision of the defendant-intervener Middlesex County retirement board (county board) denying the application of the plaintiff for an accidental disability retirement allowance. Both the appeal board and the county board appeal from a judgment in the Superior Court setting aside the decision of the county board and ordering it to approve the application. We remand the case to allow the appeal board to revise its decision to conform to the dictates of G. L. c. 30A, § 11(8). Because this case also raises an apparently novel issue concerning the deference that the appeal board should give to the subsidiary findings of a hearings officer, we address that issue as well.

The plaintiff was employed by Middlesex County as a correction officer at the Billerica house of correction. After suffering his third heart attack, he applied to the county board for a disability retirement allowance. On February 28, 1975, a medical panel convened pursuant to G. L. c. 32, §§ 6(3) and 7(1), certified that the plaintiff was totally disabled and that his disability was "such as might be the natural and proximate result of the accident or hazard undergone on account of which retirement is claimed." Thereafter the county board, citing the "available medical evidence," denied the application.

The plaintiff then sought review of the county board's determination by the appeal board. As required by G. L. c. 32, § 16(4), as amended through St. 1977, c. 363A, § 53, the appeal board assigned the appeal to the division of hearings officers (DHO) for a hearing. The plaintiff's appeal was heard by a hearings officer on January 25, 1978. The evidence presented to the hearings officer at that time included the testimony of the plaintiff and his supervisor at the time of his third heart attack and twenty documentary exhibits. We summarize that evidence.

The plaintiff testified that he began his employment with the Middlesex County department of correction in 1958 on a part-time basis. He became a full-time correction officer in 1960. From 1960 until his retirement, he steadily advanced in the correction department, becoming a training officer in 1967 or 1968, moving into personnel sometime thereafter, and later becoming personnel manager. At some point, plaintiff assumed responsibility for Billerica's furlough program and was given the title of furlough administrator.

The plaintiff worked under the direct supervision of a William Quealy for approximately the last two years that he was employed by the correction department. His responsibilities during that period frequently required him to leave the prison grounds, and, while he regularly informed Quealy of his plans, he often left the prison on his own. The plaintiff further testified that he never used his own transportation for these trips.

The plaintiff also testified at length concerning his recurring heart problems. He suffered his first heart attack on May 7, 1972, and stated that it had resulted from his efforts to quell a riot at Billerica approximately one month earlier. The plaintiff's second heart attack occurred on March 16, 1974, immediately following his involvement in another prison riot in which he had forcibly pulled several inmates from a smoke-filled cell. Both attacks resulted in the plaintiff's hospitalization and prolonged absences from work. He stated that he received some workmen's compensation benefits during both those absences.

The plaintiff returned to his job approximately six weeks after his second heart attack. Shortly thereafter Quealy assigned him the responsibility of developing a prison industries program at Billerica. Generally, this program was aimed at attracting private industry to set up machinery inside the institution in order to provide inmates with income and job training. Among the various problems raised by the program and discussed by Quealy with the plaintiff were finding suitable industrial participants and resolving insurance questions which would arise once an acceptable business partner was found.

In order to investigate the feasibility of the proposed program, the plaintiff, during the summer of 1974, wrote to many penal institutions around the country requesting information on similar programs. In addition, the plaintiff and Quealy made a number of trips to other correctional institutions and to area industries to examine similar programs and to search for potential business partners. The plaintiff stated that he discussed the insurance problems associated with the program with at least one of these businesses.

Efforts to develop the prison industries program were generally unsuccessful. The plaintiff had been unable to acquire any concrete information on analogous programs already in operation in other institutions. Similarly, he and Quealy had failed to stimulate interest among any area businesses.

Despite the lack of interest in the prison industries program among area businesses, the plaintiff, on September 10, 1974, decided to go to Boston to discuss the program's insurance aspects with his brother-in-law, an insurance executive. Early that morning he located Quealy at the prison and informed him of his plans. Quealy responded only by asking the plaintiff to pick up some books concerning prison industries at the Federal bookstore. The plaintiff had never visited his brother-in-law at his place of business prior to that date.

The plaintiff went to Boston. As was his regular practice, he took a police cruiser into East Cambridge and from there caught the subway into Government Center. While on the subway, he began to experience what were by then familiar symptoms of oncoming heart problems and took a nitroglycerine tablet to alleviate them. The pain persisted as the plaintiff walked to the Federal bookstore to pick up the books for Quealy and as he walked to his brother-in-law's office.

Despite his physical discomfort, the plaintiff met with his brother-in-law as scheduled. During their meeting, which extended through lunch at a local men's club, they discussed

both the insurance problems of the prison industries program and possible sources of suitable equipment for the program. The plaintiff's discomfort continued to increase, and sometime after 1:30 P.M. he asked his brother-in-law to find someone to drive him home. Rather than going home, however, this ride ended at St. John's Hospital in Lowell, where the plaintiff was admitted and diagnosed as having suffered a third heart attack.

The plaintiff spent a month in the hospital following that third attack. Several weeks after his discharge, he experienced additional pain and was readmitted to the hospital. These complications ultimately required open heart surgery. After a final attempt to return to work in December, 1974, the plaintiff retired from the department of correction. Since that time he has been under regular medical supervision and remains unable to engage in any significant physical activity.

The second witness testifying at the DHO hearing was William Quealy. He stated that he supervised the plaintiff from some time in 1971 until his retirement and that he had asked the plaintiff to look into the prison industries program shortly after the plaintiff returned to work following his second heart attack. In making that request he specifically instructed the plaintiff to investigate potential sources of equipment and to look into various other aspects of the program including possible insurance problems. Quealy also stated that he had made a number of trips with the plaintiff concerning the prison industries program and that the plaintiff had left the prison grounds without Quealy on other occasions for this same purpose. Like other employees under Quealy's supervision, the plaintiff was permitted to leave the premises when necessary and was not required to clear those absences with Quealy.

Quealy further testified that he discussed one such trip with the plaintiff on September 10, 1974. On that date, the plaintiff told Quealy that he was going to Boston to discuss with his brother-in-law the insurance problems associated with the program. Quealy's only response to the plaintiff's

statement was to request him to stop at the Federal bookstore to pick up some books.

Quealy also testified concerning a letter that he had written to a representative of Middlesex County's division of industrial accidents describing the plaintiff's duties on September 10, 1974. This letter, which was before the hearings officer as an exhibit, suggests that, contrary to his testimony at the hearing, Quealy had given the plaintiff the afternoon of September 10 off to have lunch with his brother-in-law and, thus, that the plaintiff's attack was not sustained while in the performance of his duties. In attempting to explain the discrepancy between the letter and his testimony, Quealy stated that he had been annoyed at the division's request because he thought it questioned the plaintiff's job performance and that he had "missed its point."

The hearings officer issued a decision which he entitled "Recommended Decision" in which he summarized the evidence introduced at the hearing, made detailed findings of fact, and made a "Conclusion and Recommended Decision." He found, among other things, that the plaintiff's primary purpose in going to Boston on September 10, 1974, was to obtain information about the insurance aspects of the prison industries program.[2] His "Conclusion and Recommended Decision" included determinations that the plaintiff suffered his September 10, 1974, heart attack while in the performance of his duties, that this attack proximately caused the disability on which his retirement claim was based, and that the determination of the county board should be reversed and the plaintiff should be awarded an accidental disability retirement allowance.

---

[2] The hearings officer also found that the plaintiff's first two heart attacks were work related. The documentary evidence before the DHO included conflicting medical opinions concerning whether there was a relationship between the plaintiff's September 10, 1974, heart attack and his prior afflictions. The only finding relating to this question was number 24. The possibility that the plaintiff's third heart attack was causally connected to the first two was not addressed by the appeal board and has not been raised in this appeal.

The appeal board affirmed the determination of the county board denying the application. The four-paragraph decision of the appeal board, which we set out in the margin,[3] determined that the plaintiff's September 10, 1974, heart attack "cannot be considered to be injury sustained while in the performance of his duties." The decision made no reference to what, if any, consideration the appeal board gave to the hearings officer's findings of fact.

The plaintiff sought review of the appeal board's decision in the Superior Court pursuant to G. L. c. 30A, § 14. On October 9, 1980, the Superior Court entered a judgment setting aside the appeal board's decision and ordering the county board to approve the plaintiff's application. In concluding that the appeal board's decision was unsupported by substantial evidence and arbitrary and capricious, the judge suggested that the appeal board had failed to explain its decision adequately and that it had erred either by failing to accept the hearings officer's findings or by rejecting them without demonstrating that they were "clearly erroneous."

1. The proceedings reviewing the determination of the county board were "adjudicatory proceedings" under G. L. c. 30A, § 1(1). While G. L. c. 32, § 16(4), now places the

---

[3] The appeal board's decision stated: "A hearing was held on January 25, 1978, on an appeal by John L. Vinal, from a decision of the Middlesex County Retirement Board denying his application for accidental disability retirement. *A recommendation was prepared by the hearing officer and is made a part of this decision.*

"On September 10, 1974, the Appellant suffered a heart attack while travelling in Boston. He had come to Boston to see his brother-in-law. In the course of the trip to Boston, he intended to discuss a work-related program and pick up a few work-related books.

"The heart attack occurred while on the MBTA and while walking on the street. In the opinion of the Appeal Board, this cannot be considered to be injury sustained while in the performance of his duties.

"*The Appeal Board rejects the recommendation of the hearing officer* and affirms the decision of the Middlesex County Retirement Board." (Emphasis supplied.)

The inconsistency between the emphasized portions of the decision, and its over-all obscurity, make it impossible to determine what, if any, parts of the hearings officer's "Recommended Decision" were adopted by the appeal board.

initial fact-finding responsibility on the DHO, this statute still provides that the appeal board "shall pass upon" the appeal and that its decision "shall be final and binding." Accordingly, regardless of the deference that the appeal board gives to the findings of the DHO, it remains obligated to accompany its decision with "a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." G. L. c. 30A, § 11(8), inserted by St. 1954, c. 681, § 1. Although § 11(8) does not call for all agency decisions to include a lengthy statement of factual and legal conclusions, it does require an agency to make subsidiary findings of fact on all issues relevant and material to its decision and to explain its reasons for reaching the conclusion(s) that it has based on those subsidiary findings. *Andrade* v. *Contributory Retirement Appeal Bd.*, 350 Mass. 447, 449 (1966). *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination*, 361 Mass. 352, 354-355 (1972). *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 497 (1976). *Rhodes* v. *State Examrs. of Plumbers*, 4 Mass. App. Ct. 767 (1976).

The appeal board's decision affirming the denial of the plaintiff's application fails to meet those requirements. Despite the factual nature of the critical issue raised by the plaintiff's application, the appeal board made virtually no mention of the subsidiary findings on which its decision was based.[4] As in *Rhodes* v. *State Examrs. of Plumbers, supra* at 768, the inadequacy of the agency's decision places a reviewing court in the position of having "no way of knowing what facts . . . [were] found to exist and whether, in reaching its general conclusion . . . the [appeal board] applied correct principles of law to the facts found by it" (quoting from *School Comm. of Chicopee* v. *Massachusetts*

---

[4] Nor did the appeal board satisfy § 11(8) by adopting any of the subsidiary findings entered by the hearings officer. The appeal board's decision stated only that the "recommendation" of the hearings officer was made a part of its decision and made no reference to his subsidiary findings.

*Commn. Against Discrimination, supra* at 355, citing *New York Cent. R.R.* v. *Department of Pub. Util.*, 347 Mass. 586, 593 [1964]).

Therefore, while we agree with the Superior Court's ruling that the appeal board's decision was deficient, we are of opinion that, rather than reversing the board, the court should have remanded the case. Accordingly, the judgment of the Superior Court must be reversed and the case remanded to allow the appeal board to revise its decision to comply with the requirements of § 11(8).

2. The procedures governing administrative review of a determination of an accidental disability retirement claim are set out in G. L. c. 32, § 16(4). That section authorizes any person aggrieved by a determination of a local board to appeal to the appeal board. Once a notice of appeal is filed, the appeal board is required to assign the appeal to the DHO for a hearing.[5] The statute further directs the appeal board to "pass upon" the appeal within six months of the conclusion of such a hearing by the DHO and provides that the decision of the appeal board "shall be final and binding on the board involved and upon all other parties." The requirement that the appeal board assign all appeals brought under § 16(4) to the DHO for a hearing was added by St. 1977, c. 363A, § 53. Prior to that amendment, the

[5] General Laws c. 7, § 4H, as amended through St. 1980, c. 579, § 60, establishes the DHO as a division within the Executive Office for Administration and Finance. This statute authorizes the appointment of a chief hearings officer and specifies three classes of hearings which "[h]e shall hear, or assign for hearing." It further authorizes him to conduct additional classes of hearings pursuant to requests from other agencies authorized to conduct adjudicatory hearings. The chief hearings officer is also authorized to promulgate regulations governing the conduct of those proceedings and is obligated to "organize his division to provide speedy and fair disposition of all appeals and to establish policies that will encourage and aid parties in limiting and consolidating issues and pleadings to the superior court." *Id.* Neither the language of G. L. c. 7, § 4H, nor its legislative history provides any guidance concerning the relationship between the appeal board and the DHO or the effect of the findings of one of its hearings officers on the appeal board.

appeal board held the hearings itself and made all the findings of fact. See G. L. c. 32, § 16(4), as amended through St. 1975, c. 872.

The defendants take the position that the appeal board is not obligated to defer to the hearings officer's subsidiary findings; they make three arguments in support of this position. First, they point to the words "pass upon" in § 16(4) and its provision that the decision of the appeal board is "final and binding" as reflecting the Legislature's desire to empower the appeal board to disregard such findings. Second, they argue that the absence of any statutory language limiting the appeal board's powers of review compels the same conclusion. Finally, they point to a number of cases decided by the Supreme Judicial Court and this court as establishing the proposition that the appeal board is the primary finder of fact in proceedings brought under § 16(4).

Before considering these arguments individually, we note that the defendants' general position would authorize the appeal board to disregard findings by the hearings officer based on oral testimony and first-hand observation of the demeanor and credibility of witnesses. As such, it is inconsistent with the well-established principle that findings "based on oral testimony will not be reversed unless plainly wrong." *Selectmen of Dartmouth* v. *Third District Court of Bristol*, 359 Mass. 400, 403 (1971).[6] Accordingly, we are reluctant to adopt the defendants' position absent a clear showing of support in either the statutory language or the

---

[6] In that case the Supreme Judicial Court explained the rationale for this rule as follows: "The reason for this rule is that the . . . [officer] who has heard the testimony and seen the witnesses face to face has a better opportunity for determining the credibility of their conflicting statements than can possibly arise from reading a record; he has a great advantage in the search for truth over those who can only read their written or printed words." 359 Mass. at 403 (citations omitted). Although *Selectmen of Dartmouth* dealt with the relationship between an agency and a reviewing court, its rationale is equally applicable here.

relevant legislative history.[7]   The language of § 16(4) fails to provide any such support.

The defendants have offered nothing to persuade us that the use of the words "pass upon" in § 16(4) authorizes the appeal board to disregard a hearings officer's subsidiary findings.   Similarly, even though § 16(4)'s provision that the appeal board's decision is "final and binding" furnishes some support for the position that the board is the primary fact finder in these proceedings,[8] that language does not address the relationship between the appeal board and the DHO or authorize the appeal board to ignore a hearings officer's subsidiary findings.

The argument that the failure of § 16(4) to limit the appeal board's review powers implies that no such limitation was intended is simply not borne out by the wording of analogous statutes.   On the one hand, the Legislature has expressed its intent clearly when it has desired to restrict an agency's review of initial factual determinations.   See G. L. c. 151A, § 41(b), as appearing in St. 1976, c. 473, § 14 (in reviewing initial determinations by the director of the Division of Employment Security, the board of review is limited to a determination "whether the director's decision was founded on the evidence in the record and was free from any error of law affecting substantial rights").   Contrast G. L. c. 18, § 16 (Department of Public Welfare bound by the decisions of its referees).   At the same time, the Legislature has also used clear language to empower an agency to

---

[7] We have not been provided with nor have we been able to locate any materials concerning the legislative history of G. L. c. 32, § 16(4), or its 1977 amendment which shed light on this question.

[8] See, e.g., *Fortier* v. *Department of Pub. Util.*, 342 Mass. 728, 735 (1961) (in concluding that the failure of a hearings officer to file a report with the DPU was not prejudicial, the court noted that the governing statute required the decision to be made by the commission).   See also *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 492 (1951) (determination that the National Labor Relations Board is not bound by a hearing examiner's findings based in part on the conclusion that the underlying statute placed responsibility for final decision on it; however, Board must give some deference to such findings.)

ignore initial administrative determinations. See G. L. c. 152, § 10, as appearing in St. 1972, c. 742, § 4 (reviewing board may revise decision of single member "in whole or in part"). Hence, the absence of language in § 16(4) addressing this problem is simply not dispositive of the Legislature's intent.[9]

While there are no reported decisions considering the relationship between the appeal board and the DHO, the defendants have cited a number of decisions which appear to support their contention that the appeal board is the primary fact finder in proceedings brought under § 16(4).[10]

---

[9] The plaintiffs also suggest that the failure of § 16(4) to require or to provide for the DHO to issue written findings and recommendations demonstrates the limited role that the Legislature intended hearings officers to play in disability retirement appeals. Were the hearings officers not required to issue written decisions containing factual findings, their function in the review process would be virtually meaningless. We are reluctant to reach such a result, particularly where the Legislature has delegated the responsibility for conducting hearings to an independent entity. See *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn.*, 378 Mass. 189, 195-196 (1979). In any event, we also note that § 6.10 of the DHO's own regulations which were in effect at the time of the 1977 amendment of G. L. c. 32, § 16(4), provided that "[d]ecisions of the Division will be made in writing and copies thereof will be forwarded to the parties simultaneously and filed pursuant to statutory provision. The rules of the Division and all final orders and decisions shall be open for public inspection at the offices of the Division." See 1 Code Mass. Regs., Part 6, § 6.10 (1975). See now 820 Code Mass. Regs. §§ 1.01 (10)(n) (2), 1.02(10)(n), & 1.03 (4) (1979). The Legislature may well have concluded that this regulation made it unnecessary to include any requirement in § 16(4) that the DHO issue written decisions.

[10] See, e.g., *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 56, 61 (1959) (in decision upholding the appeal board's power to reverse refusal of medical board to issue required medical certification based on its application of an erroneous legal standard, court noted that § 16[4] grants the appeal board broad appellate power); *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. at 495 (the appeal board has "the responsibility of deciding preliminary questions relating to credibility and weight of the evidence, and the court cannot review those preliminary decisions"); *Shrewsbury Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 5 Mass. App. Ct. 379, 382 (1977) ("[I]t is for the appeal board to determine the credibility of the evidence and — apart from a misconstruction which amounts to an error of law — its significance").

None of those decisions is of any force in the circumstances of this case, however, because they considered the appeal board's authority as it existed prior to the amendment of § 16(4) by St. 1977, c. 363A, § 53, which required the appeal board to assign appeals to the DHO. Accordingly, all dealt with a statutory scheme under which the appeal board was the only fact finder in appeals brought under § 16(4). Indeed, to the extent that the deference accorded the appeal board by these decisions reflects judicial respect for factual findings made by the body which has heard oral testimony and had the opportunity to assess credibility firsthand, they suggest that similar deference should be accorded to the hearings officer under the present statutory scheme. We therefore reject the defendants' contentions and conclude that subsidiary findings made by a hearings officer in a proceeding brought under § 16(4) must be accorded some measure of deference by the appeal board. Having reached that conclusion, we turn to the question of how much deference those findings are entitled to.

We have found no authority which speaks to that question under G. L. c. 32, § 16(4), or any analogous State statute.[11] Nevertheless, there are two standards that could be applied to resolve it: first, the "clearly erroneous" rule governing a court's review of findings made by a master in nonjury cases and, second, the principles governing the deference owed to an Administrative Law Judge's (ALJ's) findings by a Federal administrative agency.

---

[11] The only reported decisions directly considering the deference owed by an agency to initial factual determinations have been concerned with statutes which, unlike § 16(4), included some guidance concerning the standards governing intra-agency review. See, e.g., *Fountaine's Case*, 246 Mass. 513, 516-517 (1923) (under G. L. c. 152, § 10, reviewing board need not defer to findings of single member). For a case decided under G. L. c. 151A, § 41(b), see *Director of the Div. of Employment Security* v. *Fingerman*, 378 Mass. 461, 463 (1979) (if the board of review of the Division of Employment Security does not conduct an evidentiary hearing, it must uphold the factual findings of its director if they are supported by substantial evidence). Because these decisions were determined by the respective statutory provisions, they are not instructive here.

Under the "clearly erroneous" rule, as set out in Mass.R.Civ.P. 53(e)(2), 365 Mass. 820 (1974), a court must accept a master's subsidiary findings "unless they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law." *Selectmen of Hatfield* v. *Garvey*, 362 Mass. 821, 825 (1973), quoted in *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660 (1975). "The question is not what conclusion a judge reviewing the evidence might come to upon a careful reading of the transcript of the evidence, but whether it can be said from a review of the evidence that the findings made by the master, who heard and saw the witnesses, are plainly wrong." *Shelburne Shirt Co.* v. *Singer*, 322 Mass. 262, 265 (1948).

As desirable as the "clearly erroneous" rule may be in limiting a court's review of a master's findings, we believe it too rigid to govern the appeal board's obligation to defer to a hearings officer's subsidiary findings. Unlike a judge, who has discretion to limit the appointment of a master to those instances where it is appropriate, see Mass.R.Civ.P. 53(a), 365 Mass. 817 (1974), the appeal board is required to refer all appeals brought under G. L. c. 32, § 16(4), to the DHO regardless of their complexity or the nature of the issues they present. The appeal board also has no say concerning the identity of the hearings officer to whom their appeals are referred. The substantive expertise of the officers may not extend to the matters before them. Together with the absence of authority applying the "clearly erroneous" rule in an administrative context, these factors suggest that a more flexible standard is needed to ensure that the appeal board's expertise is accorded sufficient weight in the review process. The principles governing the deference owed by a Federal agency to the subsidiary findings of an ALJ provide such a standard.

The leading Federal case in this area is *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474 (1951). In that case the Supreme Court held that a Federal agency must accord the findings of an ALJ some deference. *Id.* at 492-497. It re-

jected the notion that such findings were "as unassailable as a master's" (*id.* at 492) but offered only broadly stated guidance concerning how much deference such findings should be given: "We do not require that the examiner's [ALJ's] findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." 340 U.S. at 496. Five years later, in *FCC* v. *Allentown Bdcst. Corp.*, 349 U.S. 358, 364 (1955), the court reaffirmed its holding in *Universal Camera*.

Since *Allentown*, numerous cases have attempted to refine *Universal Camera's* requirement that an ALJ's findings be accorded some deference. See generally 3 Davis, Administrative Law § 17.16 (2d ed. 1980). Although these cases have failed to adopt a uniform standard, they reflect a number of generally accepted principles.

A. *The Findings of an Administrative Law Judge Are Entitled to Some Deference.*

Virtually all the decisions in this area have reinforced the idea that the ALJ's findings are entitled to some deference. They do not, however, state precisely how much. Compare and contrast *Bangor & Aroostook R.R.* v. *ICC*, 574 F.2d 1096, 1110 (1st Cir.), cert. denied, 439 U.S. 837 (1978) (findings not based on credibility entitled to "little deference"), with *Adolph Coors Co.* v. *FTC*, 497 F.2d 1178, 1184 (10th Cir. 1974), cert. denied, 419 U.S. 1105 (1975) (ALJ's findings should be considered on review and "given such weight as they merit within reason and the light of

judicial experience"), and *International Bhd. of Teamsters* v. *NLRB*, 587 F.2d 1176, 1180 (D.C. Cir. 1978) (ALJ's findings constitute an "important part" of the record). See generally Davis, *supra*. These varying approaches suggest that the most reliable guidance may still come from the Supreme Court's observation in *Universal Camera* that "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [agency's]." 340 U.S. at 496.

B.  *Findings Based on Determinations of Credibility Should Be Entitled to Particular Deference.*

Many decisions have reflected *Universal Camera's* requirement that findings based on credibility should be accorded greater deference.  As the United States Court of Appeals for the Ninth Circuit recognized in *Loomis Courier Service, Inc.* v. *NLRB*, 595 F.2d 491, 496 (9th Cir. 1979), "[W]hen the determination of motive or purpose hinges entirely upon the degree of credibility to be accorded the testimony of interested witnesses, the credibility findings of the Trial Examiner are . . . not to be easily ignored."  See also *General Dynamics Corp.* v. *OSHA*, 599 F.2d 453, 463 (1st Cir. 1979) (credibility findings entitled to "considerable deference").  Cf. *Bangor & Aroostook R.R.* v. *ICC, supra* (ALJ's findings entitled to little deference except on matters of credibility).

C.  *When an Agency Disregards or Rejects an ALJ's Findings, It Must Explain Its Reasons for Doing so.*

Federal decisions in this area have also required an agency to set forth the reasons for its rejection of an ALJ's findings.  "While the degree of deference due the ALJ's final decision is related to the importance of credibility in a particular case, the ALJ's decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the ALJ."  *General Dynamics Corp.* v. *OSHA*, 599 F.2d at 463.  See also *International Bhd. of Teamsters* v. *NLRB*, 587 F.2d at 1181

(agency rejecting ALJ's findings must set forth the basis of its disagreement so that the reviewing court may determine whether the agency's findings are supported by substantial evidence); *Local No. 441, International Bhd. of Elec. Wkrs. v. NLRB,* 510 F.2d 1274, 1276 (D.C. Cir. 1975) (agency disagreeing with ALJ's findings must identify an awareness of that disagreement and explain it).

We believe that these general principles constitute an appropriate middle ground between the defendants' position that the appeal board should be free to disregard a hearings officer's subsidiary findings altogether and the Superior Court's view that the board's review be limited to a determination whether findings are clearly erroneous. They will permit the appeal board to conduct a meaningful review of a hearings officer's findings to determine whether they are significantly against the weight of the evidence or, in the words of *Universal Camera,* suspect in light of "the consistency and inherent probability of testimony." 340 U.S. at 496. At the same time, they will help ensure that the appeal board will carefully consider any decision to reject a hearings officer's findings and that it will provide a reviewing court with an adequate explanation on which to determine whether that rejection was warranted. Such principles are also consistent with *Norwood Ice Co.* v. *Milk Control Commn.,* 338 Mass. 435, 441-442 (1959), in which the Supreme Judicial Court, in holding that a hearing officer's report may properly be included in the record on an appeal of an administrative determination, discussed *Universal Camera* with approval. We conclude, therefore, that the appeal board should defer to subsidiary findings entered by a hearings officer according to the following guidelines: First, all subsidiary findings made by a hearings officer should be entitled to some deference; second, when those findings rest on the hearings officer's resolution of credibility questions (i.e., that a fact is true because a witness testified to it and that witness is believable), they should be entitled to substantial deference; and finally, whenever the appeal board rejects subsidiary findings made by a hearings

officer, its decision should, consistent with the requirements of G. L. c. 30A, § 11(8), contain a considered articulation of the reasons underlying that rejection.

The judgment is reversed. The decision of the appeal board is vacated, and the case is to be remanded to the appeal board for further proceedings not inconsistent with this opinion.

*So ordered.*