Wilson, Paul D., J.
This appeal concerns the pension rights of Defendant David Madden, the former Fire Chief and two-term Mayor of the Town of Weymouth. Mr. Madden took a leave of absence from his Fire Chief position when he was elected Mayor. Near the end of his eight years as Mayor, Mr. Madden arranged to be reinstated, the day after he left office, to his former position as Fire Chief but with the understanding that he would be on an unpaid leave of absence and would immediately file for retirement. That is the course Mr. Madden then followed. Mr. Madden’s retiring as Fire Chief would result in an annual pension that would be more than $33,000 higher than had he retired as Mayor.
The Plaintiff Public Employee Retirement Administration Commission (“PERAC”) decided that Mr. Madden had retired as Mayor, not as Fire Chief, and calculated his pension accordingly. Mr. Madden appealed PERAC’s decision. An Administrative Magistrate at the Division of Administrative Law Appeals (“DALA”) affirmed PERAC’s position, and Mr. Madden filed another appeal, to the Defendant Contributory Retirement Appeal Board (“CRAB”). CRAB reversed the decision of the DALA Administrative Magistrate, and directed that Mr. Madden receive the higher pension of a retiring Fire Chief. PERAC then appealed to this court under M.G.L.c. 30A, §14.
For the reasons explained below, I find that Mr. Madden’s retirement as Fire Chief cannot stand for purposes of calculating his pension. The retirement arrangement was different in some details from the retirement manipulation that the Supreme Judicial court labeled as a “sham” in Psyz v. Contributory Retirement Appeal Bd., 403 Mass. 514 (1988). But, like the arrangement in Psyz, it violated the legislative purpose of allowing more generous pensions for public safely officials to encourage early retirements. Consequently I will reverse CRAB’s decision, and direct that Mr. Madden’s pension be calculated as if he had retired as Mayor.
Background
The parties stipulated to facts and exhibits before DALA, and submitted only legal arguments. The DALA Administrative Magistrate made findings of fact based on the stipulations, which were later adopted by CRAB. The facts set forth below are taken from the DALA decision, whose Findings of Fact are found at pages 122-26 of the Administrative Record (“AR”), except for a few instances where they come from the exhibits submitted to DALA; in those cases I have included an Administrative Record citation to the exhibit itself.
David Madden was a Weymouth firefighter from 1977 through 1999, rising to the position of Fire Chief. On November 2, 1999, Mr. Madden was elected Mayor of Weymouth. He was later reelected, and the second of his two terms ended on January 1, 2008.
Under M.G.L.c. 31, §37, Mr. Madden had a right to an unpaid leave of absence from the Fire Department while he served as Mayor. Mr. Madden properly exercised that right.
As his second term as Mayor was drawing to a close, Mr. Madden desired to return to the Fire Chief position. To avoid the conflict of interest that would occur if he reappointed himself as Fire Chief, on November 5, 2007 Mr. Madden designated the Wey-mouth town solicitor as Mayor on a temporaiy basis for the purpose of reinstating him to his position as Fire Chief, effective January 2, 2008, the day after his second term ended.
However, Weymouth had a permanent Fire Chief, Robert Leary, who had been serving in that position since Mr. Madden’s election as Mayor. To permit Mr. Madden to return to the position of Fire Chief, on December 27, 2007 Mr. Leary accepted a voluntary demotion from Fire Chief to the position of Deputy Fire Chief, also effective the day after Mayor Madden’s term ended, January 2, 2008. No other Weymouth firefighters were demoted or bumped as a result of Mr. Madden’s reinstatement as Fire Chief and Mr. Leary’ s demotion to Deputy Fire Chief, apparently because these positions were to be very short-term.
On December 27, 2007, the day Mr. Leary accepted the voluntary demotion, Mr. Madden wrote to the Mayor-elect of Weymouth, Susan Kay, and informed her that he would become Fire Chief once again as of January 2, 2008. In that letter, Mr. Madden informed Mayor-Elect Kay that he wanted her to place him on an unpaid leave of absence on the day he returned to the Fire Chief post, and then he would immediately file his retirement papers. See AR 58 (Findings of Fact of Weymouth Retirement Board); AR 72 (letter from Madden to Kay dated *223 December 27,2007). Mr. Madden suggests in his brief that this arrangement resulted from negotiations between Mr. Madden and Mayor -Elect Kay that occurred after Fire Chief Leary threatened litigation over Mr. Madden’s reappointment as Fire Chief. See Mr. Madden’s Memorandum in Opposition to PERAC’s Motion for Judgment on the Pleadings at 4 (citing FindingNo. 16 of the Weymouth Retirement B oard, AR 58-59).
On January 2, 2008, Mayor Kay placed Mr. Madden, now once again the Fire Chief, on an unpaid leave of absence. Mayor Kay correctly understood that Mr. Madden would not work again as Fire Chief, but instead would immediately file for retirement from his position as Fire Chief. Indeed, on January 3,2008, Mr. Madden filed for superannuation retirement with the Weymouth Retirement Board, asking that the retirement be effective January 4, 2008. See AR 42 (PERAC letter of State Retirement Board dated July 15, 2008). Mr. Madden never performed any of the duties of the Weymouth Fire Chief from January 2, 2008 to his retirement on January 4, 2008, nor did he intend to do so, nor did Mayor Kay intend him to do so. Mr. Madden retired at the age of 53. See AR 43 (PERAC form).
In his retirement application, Mr. Madden sought retirement from the position of Fire Chief, a Group 4 position under M.G.L.c. 32, §3(2)(g). Generally speaking, Group 4 covers public safety positions and other positions that expose employees to physical danger, specifically including “members of police and fire departments” (with exceptions not relevant here). M.G.L.c. 32, §3(2)(g). On January 23, 2008, the Wey-mouth Retirement Board submitted to PERAC its calculations for Mr. Madden’s retirement, calculating the retirement under Group 4 from the job of Fire Chief.
On March 13, 2008 PERAC remanded the calculations to the Weymouth Retirement Board to make findings of fact about whether Mr. Madden should instead be regarded as having retired from his position as Mayor, a Group 1 position under M.G.L.c. 32, §3(2)(g) which would entitle him to a less lucrative pension. AR 60 (PERAC letter of remand). The Weymouth Retirement Board held an evidentiary hearing, and, on May 27, 2008 issued findings of fact and a conclusion that Mr. Madden was entitled to retire from the position of Fire Chief under Group 4.
On June 5, 2008, PERAC rejected the Weymouth Retirement Board’s calculation of Group 4 superannuation retirement for Mr. Madden from the position of Fire Chief. Instead, PERAC calculated Mr. Madden’s retirement based on a Group 1 classification, on the theory that the last job he had worked was that of Mayor.
Mr. Madden appealed PERAC’s decision to DALA. The Weymouth Retirement Board did not appeal, but instead began paying Mr. Madden the retirement allowance permitted by PERAC under Group 1.
DALA affirmed PERAC’s position that Mr. Madden had retired in a Group 1 classification as Mayor. Mr. Madden appealed the DALA ruling to CRAB, which reversed the decision, allowing Mr. Madden’s retirement under the Group 4 position of Fire Chief. PERAC appealed the CRAB decision to this Court.
Mr. Madden’s current pension under Group 1 is $46,263.24 per year. If he had received the Group 4 classification, he would be receiving $79,821.32 annually.
Analysis
1. Standard of Review
A CRAB decision is ordinarily entitled to considerable judicial deference. As the Supreme Judicial Court put it recently, ‘The findings of CRAB, if supported by substantial evidence, will be determinative.” Murphy v. Contributory Retirement Appeal Board, 463 Mass. 333 (2012), citing Namay v. Contributory Retirement Appeal Board, 19 Mass.App.Ct. 456 (1985). On appeal of a CRAB decision, ‘The court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” M.G.L.c. 30A, §14(7). Areviewing court may not substitute its judgment for that of CRAB. Southern Worcester County Regional Vocational School Dist. v. Labor Relations Comm., 386 Mass. 414, 420-21 (1982).
Judicial deference, however, does not mean that the courts abdicate their responsibility to review CRAB’s decisions. Water Department ofFairhaven v. Department of Environmental Protection, 455 Mass. 740, 744 (2010); Town Fair Tire Centers, Inc. v. Commissioner of Revenue, 454 Mass. 601, 605 (2009). That is especially so as to CRAB’s legal conclusions, as opposed to its factual findings, because “an incorrect interpretation of a statute by an administrative agency is entitled to no deference.” Id., citing Kszepka’s Case, 408 Mass. 843, 847 (1990). The duty of statutory interpretation rests ultimately with the courts, not the administrative agency. Town Fair Tires, 454 Mass, at 605, citing Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006), and Cleary v. Cardullo’s, Inc., 347 Mass. 337, 343-44 (1964).
Judicial review focuses on the decision of CRAB, which is the ultimate decision maker here. CRAB is not bound by DALA magistrate’s decision. Vinal v. Contributory Retirement Appeal Board, 13 Mass.App.Ct. 85, 101-02 (1982). The subsidiary factual findings of the DALA magistrate are entitled to “some deference” by CRAB, Murphy, 463 Mass. at 336, citing Vinal, 13 Mass.App.Ct. at 101, but here CRAB not only gave “some deference” to those factual findings, it adopted them in its decision, and specifically *224 rejected PERAC’s attack on those findings. CRAB sim: ply disagreed with the legal conclusion that DALA drew from those facts.
2. The Reinstatement Statute
While Plaintiff PERAC suggests that CRAB’s decision is not based upon substantial evidence, it does not really press that point. Instead, PERAC focuses its fire on the argument that CRAB’s decision is erroneous as a matter of law.
Under M.G.L.c. 31, §37, “Any person elected . . . by the people to the office of mayor who is a permanent employee in a civil service position . . . shall, upon his written request made to the appointing authority, be granted a leave of absence without pay from his civil service position . . . and shall not, as a result of such election, be suspended or discharged or suffer any loss of rights under the civil service law and rules.” Upon demand, a mayor who takes such an unpaid leave of absence “shall be reinstated at the end of the period for which the leave was granted.” Id.
Before CRAB, PERAC argued that this right to reinstatement at the end of an unpaid leave of absence to serve as mayor is not absolute, because, in addition to the language quoted above about the right to reinstatement, section 37 further provides for a hearing if the appointing authority fails to reinstate a mayor to his former civil service position. CRAB specifically rejected PERAC’s argument on this point, holding that section 37 required the city to reinstate Mr. Madden as Fire Chief upon the conclusion of his service as an elected Mayor. PERAC does not renew that argument before this court.
3. Was Mr. Madden Reinstated under Section 37?
But, assuming that Mr. Madden had an absolute right to reinstatement as Fire Chief, was he in fact reinstated to that position? PERAC argues here, as it did below, that he was not. Mr. Madden never actually served as the Fire Chief, PERAC states, during the three days he held that position after his mayoral term ended. PERAC suggests that the entire arrangement that resulted in Mr. Madden’s three days of service as Fire Chief in 2008—Mr. Madden’s appointing an acting Mayor in November 2007 for the sole purpose of reinstating Mr. Madden to his Fire Chief position two months later; Mayor-Elect Kay’s acquiescence based on Mr. Madden’s agreement in advance that he would immediately take unpaid administrative leave and would immediately file for retirement; the brief voluntary demotion of the Fire Chief who had held that position for eight years without any other resulting demotions or bumping of other firefighters to lower positions or off the payroll altogether; and then Mr. Madden’s failure to perform any of the duties of Fire Chief for the three days that he held that position—was a sham, unworthy of recognition as a legitimate Group 4 retirement.
In short, PERAC is suggesting that, in accepting Mr. Madden’s retirement from Group 4 at face value, CRAB simply misinterpreted M.G.L.c. 31, §37. Because these machinations were improper, PERAC argues, Mr. Madden did not really retire as Fire Chief, but rather he retired as Mayor.
PERAC’s argument requires a consideration of the meaning of the phrase “shall be reinstated at the end of the period for which the leave was granted” (emphasis added) in M.G.L.c. 31, §37. This provision is found in the civil service statute, Chapter 31, not in the pension statute, Chapter 32, which CRAB is charged with interpreting. As a result, CRAB’s interpretation is not necessarily entitled to deference from the courts. See Namay, 19 Mass.App.Ct. at 463 (“Courts look for and will normally court great weight to an administrative agency’s interpretation—particularly if long-standing—of the law which the agency is charged to administef’) (emphasis added).
PERAC bases its legal argument, that sham job changes should not alter retirement rights, on Psyz v. Contributory Retirement Appeal Bd., 403 Mass. 514 (1988). Psyz involved a long-time storekeeper working at a state hospital run by the Department of Mental Health. After he applied for retirement, the storekeeper accepted a position, for the last two weeks before his retirement, as a mental health assistant at the state hospital. That job involved direct patient care and therefore entitled the employee to a classification upon retirement in Group 2 rather than Group 1, and thus a more generous pension. In that case, CRAB determined that the employee should have been retired from Group 1. The Supreme Judicial Court affirmed, noting that the magistrate had concluded that the storekeeper’s employment as a mental health assistant was a “ ‘sham’ designed to circumvent the statute.” Id. at 516. The Supreme Judicial Court agreed with that assessment, calling the late-career promotion “manipulation of the system [that] cannot reasonably be regarded as coming within the legislature’s intent.” Id. at 518.
CRAB argues that, “(i]f Psyz sets the standard for what constitutes a sham, then it is clear that the facts of the present case do not make one out.” CRAB Decision, AR 380. CRAB emphasizes that CRAB found that the employee in Psyz had no training for the patient-care position he assumed, and thus the employer never considered him a true Group 2 employee. Today’s case is far different, CRAB stated in its decision, because there is no doubt that Mr. Madden was qualified to serve as Fire Chief. Therefore his reinstatement to that position could not be a sham, CRAB concluded.
*225 In its consideration of the Psyz case, CRAB did indeed emphasize the employee lacked qualifications for the job from which he attempted to retire, and therefore was entitled only to the less generous Group 1 pension. The Supreme Judicial Court reached the same conclusion in Psyz, but from a different direction altogether.
In affirming that the employee was not entitled to a Group 2 retirement, the Psyz court emphasized that, by law, employees in Group 2 attained their maximum benefits at an earlier age because the duties they perform, such as direct patient care in a state mental institution, are
considerably more hazardous than the employment in Group 1. Providing early retirement incentives to employees with hazardous duties, as is accomplished through Group 2 classification, has the effect of making room for younger employees better able to perform that work. It would not be reasonable to construe G.L.c. 32, §3(2)(g) as permitting the transfer of a Group 1 employee engaged in nonhazardous work to Group 2 solely to enable the employee to obtain benefits the Legislature designed as an incentive for the early retirement of employees engaged in more hazardous endeavors.
Psyz, 403 Mass, at 516. Employees such as firefighters are classified in Group 4 because they, too, perform more hazardous duties than most state and municipal employees. See Gaw v. Contributory Retirement Appeal Bd., 4 Mass.App.Ct. 250, 253 (1976) (discussing special report of the Retirement Law Commission that recommended the creation of Group 4).
Had Mr. Madden actually been serving as Fire Chief, his opportunity to collect a substantial pension at the relatively young age of 53 would certainly have served the statutory goal of making room for a younger employee in the Weymouth Fire Department. However, Mr. Madden had actually left the Fire Department for his less hazardous mayoral duties eight years earlier. The Department was not holding a space open for him. Mr. Leary’s appointment to the Fire Chief position when Mr. Madden left was not a temporary appointment. Nothing in the record suggests that, upon Mr. Madden’s retirement, the Weymouth Fire Department filled a spot anywhere in its hierarchy that it had been holding open for eight years in the expectation that Mr. Madden would someday return to the Fire Chief position. In short, regardless of whether Mr. Madden was qualified serve as a Fire Chief, his retirement with a generous Group 4 pension did not have the effect that, according to the Supreme Judicial Court, the legislature intended when it authorized Group 4 pensions: it did not make room for a younger employee better able to perform the hazardous work of a firefighter.
While Mr. Madden held the position of Fire Chief from January 2 to January 4,2008, he did not exercise the duties or carry out the responsibilities that came with that position. He never reported to work, in fact, having agreed in advance to take an unpaid leave of absence so that he could immediately file his retirement papers. I conclude that Mr. Madden was never “reinstated” to the position of Fire Chief in the manner anticipated by the legislature when it granted him a right, in M.G.L.c. 31, §37, “to be reinstated at the end of the period for which the leave [to serve as Mayor] was granted.”
I find support for this conclusion in the 2011 amendment to M.G.L.c. 32, §3(2)(g), which now requires that employees seeking to retire from a Group 4 position must actively perform the duties of the position for at least 12 consecutive months immediately preceding their retirement. 2011 Mass. Acts c. 176, §8. Had this amendment been in effect when Mr. Madden retired, it would have made clear that he could not lay claim to a Group 4 pension merely by holding a Group 4 position for three days immediately before he retired. Because the amendment was not yet in effect, Mr. Madden argues, he is perfectly entitled to do what he did. But, although I find the amendment instructive as to the legislature’s intent about entitlement to Group 4 pensions, I do not rest my decision on M.G.L.c. 32, §3(2){g), but rather on an interpretation of the word “reinstated” in M.G.L.c. 31, §37. Thus I do not decide whether the pre-amendment version of M.G.L.c. 32, §3(2) (g) would have allowed Mr. Madden a Group 4 pension for his three days of service as Fire Chief immediately before his retirement. I find instead that, because Mr. Madden was on unpaid administrative leave during those three days, as a matter of substance he never served as Fire Chief at all after his service as Mayor.
4. Fairness to Mr. Madden
In opposing PERAC’s request that I overturn CRAB’s decision, Mr. Madden points out that he did actually work as a firefighter for approximately 20 years, hinting that there would be some injustice, therefore, in denying him a Group 4 pension. A Superior Court decision, Brady v. State Board of Retirement, 29 Mass. L. Rptr. 302, 2011 WL 7111561 (Mass.Super), answers that argument. The employee in Brady had worked as a Correction Officer, a position in Group 4, until he accepted a series of promotions that ultimately made him a deputy superintendent of a Department of Correction facility, a position with lesser pension benefits. When he retired, the employee noted that he was on a continuing leave of absence from his last Group 4 position as Correction Officer III, and thus was entitled to a Group 4 pension. Both CRAB and the Superior Court held that the employee was not entitled to retire from Group 4. The Superior Court noted that the employee had voluntarily accepted “a position with substantially *226 greaterresp onsibility .prestige .and .presumably .pay . . . There is no reason to read into §3(2)(g) some unstated right to be classified in Group 4, because many years ago Brady was promoted from a position thatofferedtheopportunityforearlierretirement.”Id. at *4. The Supreme Judicial Court followed similar reasoning in Maddocks v. Contributory Retirement Appeal Bd., 369 Mass. 488, 494 (1975), which concerned a nurse at a state mental hospital who worked in a Group 2 patient-care position for 13 years but, one year before retirement, accepted a promotion to a Group 1 supervisory position. The court affirmed CRAB’s decision that the nurse was entitled only to a Group 1 retirement, noting, “The plaintiff accepted of her own free will a promotion in status and a concomitant increase in pay ...”
Mr. Madden, too, made a voluntary choice to leave his position as Fire Chief to serve eight years as Mayor, a position of greater responsibility and prestige, or so he must have felt. While spending those eight years otherwise employed, Mr. Madden had a statutory right to return the Fire Chief position—just as the plaintiff in Brady was still technically classified on the day of his retirement in a Group 4 position that he had not actually occupied for years. It is true that the Brady plaintiff, unlike Mr. Madden, did not seek a demotion to his former Group 4 position before retiring, but Mr. Madden’s actions, in obtaining reinstatement to a Group 4 position without ever carrying out its duties, are not very different. Under the logic, if not the exact facts, of both Maddocks and Brady, Mr. Madden must be held to his voluntary choice to forsake for many years a position that provided Group 4 retirement benefits.
The outcome would be different if Mr. Madden’s reinstatement to the Fire Chief position had been more than a sham. If he had actually carried out his duties as Fire Chief for some length of time, so that the last position in which he worked was Fire Chief rather than Mayor, he would have certainly been entitled to a Group 4 pension. But he did not carry out those duties.
Conclusion
CRAB granted a Group 4 retirement to Mr. Madden simply because he occupied a Group 4 position, without carrying out any of its duties and without even being paid, for only the last three days of his working life. That decision elevated form over substance, and failed to account for Mr. Madden’s manipulation of the pension system. The Plaintiff Public Employee Retirement Administration Commission’s Motion for Judgment on the Pleadings is ALLOWED.